UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

TAPPER'S FINE JEWELRY, INC.,

     Plaintiff,

v.

CHUBB NATIONAL INSURANCE
COMPANY,

     Defendant.

Case No. 14-13280
Honorable Laurie J. Michelson
Magistrate Judge Mona K. Majzoub

---

**OPINION AND ORDER DENYING CROSS MOTIONS FOR SUMMARY
JUDGMENT [18, 20]**

---

Plaintiff Tapper's Fine Jewelry usually sells jewelry to consumers. But a few years ago, it started to buy consumers' jewelry and then deliver it in bulk to a refiner to melt the jewelry into bars. After testing the bars to determine their content, the refiner would generally pay Tapper's a sum of money to keep the bars. After two of Tapper's deliveries in 2013, however, the refiner did not pay what it owed. The refiner's owner then disappeared, and has not been heard from since. Tapper's filed an insurance claim, but Defendant Chubb National Insurance Company denied coverage. As a result, Tapper's filed this breach of contract case against Chubb.

The parties dispute the nature of Tapper's arrangement with the refiner. Chubb argues that Tapper's sold the bars to the refiner "under a deferred payment sales agreement," which would put Tapper's losses outside of the scope of "covered property" under the relevant insurance policies. But Tapper's claims that it never intended to complete any sale until after the refiner determined the bars' content and value, which never happened in the transactions at issue here. The parties also dispute what happened to the bars once in the refiner's hands. Chubb argues that the refiner stole the bars, putting Tapper's losses squarely within an exclusion for

"dishonest or criminal acts." But Tapper's claims that one can only speculate as to what happened.

Despite these factual disputes, both parties filed motions for summary judgment, arguing that the undisputed facts favor only their own position. (Dkts. 18, 20.) After careful consideration of the briefs and thorough review of the record, the Court finds that oral argument will not aid in resolving the pending motions. *See* E.D. Mich. LR 7.1(f)(2). Given the genuine issues of material fact, the Court will deny both motions for summary judgment.

## I.

## A.

Plaintiff Tapper's Fine Jeweler's, Inc. is a jewelry retailer in Michigan. (Dkt. 18, Pl.'s Mot. Summ. J. Ex. 1, H. Tapper Dep. at 7.) In 2009, Tapper's started a new business line to take advantage of rising precious metals prices, opening several "Tapper's Gold Exchange" locations. (*Id.* at 7–9.)

Under this new business model, individuals would sell jewelry they no longer wanted to Tapper's. (*Id.* at 9.) Tapper's would hold onto the jewelry for at least nine days in case the seller had a change of heart (and as required by state law). (*Id.* at 10.) Jewelry sold to Tapper's would then generally be utilized in one of three ways. First, Tapper's would resell some items in its retail stores. (Pl.'s Mot. Ex. 2, M. Tapper Dep. at 10.) Second, Tapper's would sell some items to a wholesaler. (*Id.*) Third, and the only option relevant here, Tapper's would often enlist a refiner to melt the jewelry into bars. (*Id.*)

A company known as PMG served as Tapper's refiner, and the two typically used the following process. (*See* Pl.'s Mot. App'x 1.) Tapper's owner, Howard Tapper, would take jewelry to PMG, and if he had not already sorted it into bags for different metals (gold, silver,

platinum, etc.), he would do so at PMG. (H. Tapper Dep. at 13.) PMG would then melt the jewelry into bars. (*Id.* at 14.) Next PMG would perform a preliminary "assay"—a test to determine the bars' composition—and provide a small sample of each bar so that Tapper's could confirm the results with further testing. (*Id.*) Finally, PMG would send the bars to another refiner for a final assay. (*Id.* at 15.)

PMG would initially pay Tapper's 85% of the bars' anticipated value the day after Tapper's delivered the jewelry to PMG. (*Id.* at 15.) PMG's payments were priced according to spot prices (per ounce) in the relevant precious metals market on the day of delivery. (*Id.* at 16, 25.) For example, PMG would pay Tapper's 99% of the spot price per ounce for gold, 95% for silver, and 85% for palladium. (Pl.'s Resp. Ex. 5.) So spot market prices would influence Tapper's decision to delivery jewelry; it would sometimes wait to deliver to lock in a higher price. (*Id.* at 16–18.) After PMG's refiner completed the final assay to determine the bars' content, assuming there was no major discrepancy, PMG would calculate and pay Tapper's the balance owed beyond the 85% initial payment. (*Id.* at 19–25.) In exchange, PMG kept the bars. (*Id.* at 24.)

Over the course of several years, Tapper's and PMG did roughly $51 million of business in this way without incident. (*Id.* at 30; Def.'s Mot. Ex. 3, Letter from H. Tapper.) But two transactions were different.

### B.

On July 11, 2013, Tapper's dropped off jewelry that was sorted into three bags. (Pl.'s Mot. Ex. 5, Jul. Calculation Summ.) According to a summary prepared by PMG, the first bag, which had gold, platinum, and palladium, added up to a value of $61,047.46 based on the initial assay and the percentages of the spot prices PMG would pay. (*Id.*) PMG did not calculate an

estimate for the second and third bags, which contained platinum and gold scrap. (*Id.*) But Tapper's estimates the total value of all three bags for the July delivery at $129,118.72. (H. Tapper Dep. at 45.) Instead of paying 85% of the total value the next day like usual, PMG asked Howard Tapper for more time, and he agreed. (*Id.* at 27.)

On September 18, 2013, after successful transactions in August, (*see* Def.'s Mot. Ex. 3, Report; H. Tapper Dep. at 30), Tapper's delivered more jewelry to PMG, (Pl.'s Mot. Ex. 7, Sep. Calculation Summ.). PMG's initial estimated value for the first bag (containing gold and silver) was $77,188.64. (*Id.*) PMG valued the second bag (also gold and silver) at $84,625.60. (*Id.*) The third bag had gold valued at $11,025.88. (*Id.*) Two other bags had stones, the final value of which PMG did not indicate. (*Id.*) PMG calculated the total price at $172,840.12. (*Id.*) At Howard Tapper's request, PMG paid Tapper's via check that day. (H. Tapper Dep. at 30.) The check was for $137,542.10, roughly 80% of the estimated total value, leaving a balance of $35,298.02. (Sep. Calculation Summ.; Pl.'s Mot. Ex. 8, Check.)

PMG neither paid the balances for the July or September 2013 deliveries nor returned Tapper's refined metal bars. Tapper's Chief Financial Officer, Robert Hutter, tried to collect the money PMG owed by making several calls. (Pl.'s Mot. Ex. 6, Hutter Dep. at 23–24.) He testified that the one response he could recall was that PMG had "a timing difference on them getting their funds and being able to pay funds." (*Id*. at 24.) In October 2013, Howard Tapper also got in touch with PMG's owner, Allan Light, who apologetically said "he would get [Tapper] the money." (H. Tapper Dep. at 33.) That was the last time Howard Tapper spoke with Light. (*Id*.)

The next month, Howard Tapper reported Tapper's losses from PMG to the Redford Police Department. (Pl.'s Mot. Ex. 9, Police Report.) The police report indicated that Light had also called the police to report that two of his employees were stealing from him. (*Id.* at 3.)

4

## C.

On January 16, 2014, Tapper's sought to recover its losses by filing a claim under two "Jeweler's Block" insurance policies it had with Defendant Chubb National Insurance Company. (Pl.'s Resp. Ex. 10, Property Loss Notice.) One policy was in effect from August 1, 2012 to August 1, 2013, during the July delivery. (Pl.'s Mot. Ex. 3, 2012–13 Policy at 1.) The other policy was in effect from August 1, 2013 to August 1, 2014, during the September delivery. (Pl.'s Mot. Ex. 4, 2013–14 Policy at 1.) Tapper's paid a premium of $44,076.00 for the first policy and $59,619.00 for the second policy to cover certain property losses. (2012–13 Policy at 1; 2013–14 Policy at 1.)

The relevant provisions were the same under each policy. Chubb agreed to "pay for direct physical loss of or damage to Covered Property from any of the Covered Causes of Loss." (2012–13 Policy, Jewelers Block Coverage Form at 1; 2013–14 Policy, Jewelers Block Coverage Form at 1.) The policies defined "Covered Causes of Loss" as "Direct Physical Loss or Damage to the Covered Property except those causes of loss listed in the Exclusions." (*Id.*) Coverage included a $100,000 limit for "PROPERTY AT PREMISES OF ANY DEALER, PROCESSOR OR SIMILAR BAILEE IN THE JEWELRY TRADE." (2012–13 Policy, Jewelers Block Decls.; 2013–14 Policy, Jewelers Block Decls. (emphasis in originals).)

Two coverage limitations are at issue in this case. First, the policies stated that "Covered Property does not include," among other things, "Property sold under a deferred payment sales agreement after it leaves your premises." (2012–13 Policy, Jewelers Block Coverage Form at 1; 2013–14 Policy, Jewelers Block Coverage Form at 1.) Second, the policies excluded "loss or damage caused by or resulting from any . . . Dishonest or criminal act committed by [certain people, including] . . . Anyone else to whom the property is entrusted" (with a few exceptions

5

that are irrelevant here). (2012–13 Policy, Jewelers Block Coverage Form at 3; 2013–14 Policy, Jewelers Block Coverage Form at 3.)

**D.**

Chubb rejected Tapper's claim by letter on February 5, 2014. (Pl.'s Resp. Ex. 10, Letter from Dana Staton.) Chubb reasoned that the loss was not "fortuitous" and that "[t]here was not an act committed upon the Covered Property that caused direct physical loss or damage to the Covered Property." (*Id.* at 2.) Chubb also said that certain exclusions applied, including the exclusion for losses from dishonest or criminal acts. (*Id.* at 2–3.) Chubb also said that money did not qualify as "Covered Property" under the policies. (*Id.* at 3.) Later that month, Tapper's counsel responded to dispute Chubb's position. (Pl.'s Resp. Ex. 12, Letter from Philip Cwagenberg.)

The next month, Dana Staton, a Property Claims Examiner with Chubb, left a voicemail for Tapper's counsel and said that Chubb had changed course and would provide coverage. (Dkt. 21, Pl.'s Resp. Ex. 22, Mar. 18, 2014 File Note.) David Trippel, Staton's supervisor at Chubb, similarly wrote in an internal email that month that Chubb would pay the claim (subject to per occurrence limits of $100,000), in part because "we can not prove a dishonest act on the part of the refiner." (Pl.'s Mot. Ex. 18, Email from David Trippel.)

But by April 2014, Chubb again changed its position, this time denying coverage for three reasons. (Pl.'s Mot. Ex. 13, Letter from James Hamilton.) First, Chubb asserted that Tapper's losses to PMG stemmed from "property sold under a deferred payment sales agreement" and thus were not "Covered Property." (*Id.* at 2.) Second, Chubb stated that the dishonest act exclusion applied. (*Id.*) Finally, Chubb said that the losses did not fall within the policies' limited coverage for losses of money. (*Id.*) The author of that letter, Chubb Home

6

Office Property Claims Examiner James Hamilton, had previously written to Trippel that he wanted to "consider" the provision relating to "[p]roperty sold under a deferred payment sales agreement after it leaves your premises." (Pl.'s Mot. Ex. 16, Email from James Hamilton.) Tapper's counsel again wrote a response letter (Pl.'s Mot. Ex 14), and Chubb reiterated that it would deny coverage (Pl.'s Mot. Ex. 15).

Tapper's thus filed a three-count Complaint against Chubb in Oakland County Circuit Court on August 1, 2014, and the suit was removed to this Court on August 25, 2014. (Dkt. 1, Notice of Removal.) Count I asserts a breach of contract claim. (Compl. ¶¶ 30–41.) Count II asserts a claim under the Uniform Trade Practices Act. (Compl. ¶¶ 42–47.) And Count III asserts a claim under the Michigan Consumers Protection Act. (Compl. ¶¶ 48–54.)

Chubb filed its motion for summary judgment on June 3, 2015. (Dkt. 18.) Tapper's filed its on June 9, 2015. (Dkt. 20.)  Both motions are fully briefed. (*See* Dkts. 21–23.) In its response to Chubb's motion, Tapper's indicated that it has agreed to withdraw Count III. (Dkt. 21, Pl.'s Resp. at 22.) Thus, that count will be dismissed.

## II.

Because Chubb seeks summary judgment on claims for which it does not bear the burden of persuasion at trial, Chubb may discharge its initial summary-judgment burden by "pointing out to the district court . . . that there is an absence of evidence to support [Tapper's] case." *See Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). If Chubb does so, Tapper's "must come forward with specific facts showing that there is a genuine issue for trial." *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The Court must then determine whether the evidence presents a sufficient factual disagreement to require submission of Tapper's claims to a jury, or whether the evidence is so one-sided that Chubb must prevail as a

matter of law. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). In making this determination, the Court views the evidence, and any reasonable inferences drawn from the evidence, in the light most favorable to Tapper's. *See Matsushita*, 475 U.S. at 587.

Tapper's summary judgment burden is greater. Because it seeks summary judgment on claims for which it has the burden of persuasion, Tapper's showing "must be sufficient for the court to hold that no reasonable trier of fact could find other than for [it]." *See Calderone v. United States*, 799 F.2d 254, 259 (6th Cir. 1986) (quoting W. Schwarzer, *Summary Judgment Under the Federal Rules: Defining Genuine Issues of Material Fact*, 99 F.R.D. 465, 487–88 (1984)). In making this determination, the Court views the evidence, and any reasonable inferences drawn from the evidence, in the light most favorable to Chubb. *See Matsushita*, 475 U.S. at 587.

### III.

Tapper's claims were removed to this Court under its diversity jurisdiction. "[F]ederal courts sitting in diversity 'apply state substantive law and federal procedural law.'" *Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*, 559 U.S. 393, 417 (2010) (quoting *Hanna v. Plumer*, 380 U.S. 460, 465 (1965)). When deciding issues of substantive law, this Court must apply the law of the state's highest court. *Saab Auto. AB v. Gen. Motors Co.*, 770 F.3d 436, 440 (6th Cir. 2014). If the state's highest court has not decided the applicable law, state law must be ascertained "'from all relevant data,' which includes the state's appellate court decisions." *Id.* (quoting *Garden City Osteopathic Hosp. v. HBE Corp.*, 55 F.3d 1126, 1130 (6th Cir. 1995)).

"Interpretation of [an insurance policy] is a question of law, and Michigan courts look to the language of the insurance policy and interpret the terms therein in accordance with Michigan's well-established principles of contract construction." *Fed.–Mogul U.S. Asbestos*

8

*Pers. Injury Trust v. Cont'l Cas. Co.*, 666 F.3d 384, 387 (6th Cir. 2011) (internal quotation marks and citations omitted). Such principles include the following:

> First, an insurance contract must be enforced in accordance with its terms. A court must not hold an insurance company liable for a risk that it did not assume. Second, a court should not create ambiguity in an insurance policy where the terms of the contract are clear and precise. Thus, the terms of a contract must be enforced as written where there is no ambiguity.

*Id.* (quoting *Citizens Ins. Co. v. Pro–Seal Serv. Group, Inc.*, 730 N.W.2d 682, 685 (Mich. 2007)). A court must "view the policy as a whole, striving to give meaning to each of its terms and avoid redundancy or surplusage." *Fed.–Mogul*, 666 F.3d at 388 (citation omitted). "While it is the insured's burden to establish that his claim falls within the terms of the policy . . . the insurer should bear the burden of proving an absence of coverage." *Hunt v. Drielick*, 852 N.W.2d 562, 565 (Mich. 2014) (internal quotation marks and citations omitted).

## A.

Chubb first argues that it is entitled to summary judgment because Tapper's has failed to meet its burden to establish coverage for its losses. Chubb says that as a matter of law, the following provision precludes Tapper's from establishing coverage: "Covered Property does not include . . . Property sold under a deferred payment sales agreement after it leaves your premises." (2012–13 Policy, Jewelers Block Coverage Form at 1; 2013–14 Policy, Jewelers Block Coverage Form at 1.) This is a close call. But the Court finds that while Tapper's is far from prevailing on its own motion for summary judgment on this issue, it has raised a genuine issue of material fact.

Tapper's contends that "there is no evidence, whatsoever, that any sale, under any terms, occurred" and that Chubb "can offer no evidence to support that the claim [sic] that any type of a 'deferred payment sales agreement' existed." (Pl.'s Mot. at 14, 16.) Yet the record contains

numerous facts consistent with the conclusion that Tapper's losses to PMG were the result of "[p]roperty sold under a deferred payment sales agreement after it le[ft] [Tapper's] premises."

Sales of goods under Michigan law are governed by Article II of Michigan's Uniform Commercial Code, which defines a sale as "the passing of title from the seller to the buyer for a price." Mich. Comp. Laws Ann. § 440.2106(1). The course of dealing between Tapper's and PMG suggests that Tapper's routinely did just that: passed title in jewelry (later refined into bars) to PMG, for a price. *See Id.* at § 440.1303(4) (providing that course of dealing "is relevant in ascertaining the meaning of the parties' agreement, may give particular meaning to specific terms of the agreement, and may supplement or qualify the terms of the agreement"). For one, Tapper's delivered jewelry to PMG. That Tapper's often waited to do so for a time when it thought market prices were favorable strongly suggests that Tapper's intended to sell its goods to PMG. (H. Tapper Dep. at 16–17.) After PMG refined the jewelry into bars, PMG would pay Tapper's for the bars, reinforcing the conclusion that a reasonable jury could find that the transactions within PMG and Tapper's usual course of dealing were "sales."

A reasonable jury could also find that PMG's payments under the transactions were "deferred." In particular, PMG would pay Tapper's 85% of the bars' anticipated value a day or so after delivery, with a final payment coming later after the final testing. (H. Tapper Dep. at 15, 24.) In other words, when Tapper's sold bars to PMG, it arguably did so "under a deferred payment sales agreement." Tapper's course of dealing with PMG in this manner extended over several years and totaled $51 million in business. (Def.'s Mot. Ex. 3, Letter from H. Tapper; H. Tapper Dep. at 30.)

It would not be unreasonable to find that the July and September 2013 deliveries at issue here fit this mold: Tapper's delivered jewelry to PMG in exchange for PMG's promise to pay

10

sometime later. After Tapper's July 2013 delivery, though PMG did not pay the next day, it implicitly promised to pay later by requesting to do so. (H. Tapper Dep. at 27.) The summary prepared by PMG indicated, "INITIAL ASSAY FOR ADVANCE; PAYMENT BASED ON FINAL SETTLEMENT," which further suggests that final payment would be deferred. (Jul. Calculation Summ. (emphasis in original).) In September 2013, Tapper's delivered more jewelry, and because Howard Tapper asked to be paid immediately, PMG cut Tapper's a check (for roughly 80% of the estimated value of Tapper's delivery). (Howard Tapper Dep. at 30.) But that still left balance to be paid later, i.e., a deferred payment. (*See* Sep. Calculation Summ.)

Furthermore, because of the balances PMG owed Tapper's from July and September, Tapper's tried to obtain the money, strongly suggesting that Tapper's contemplated deferred payments as part of a final sales agreement. For instance, in October, Howard Tapper called PMG's owner and said, "I needed the money, could he please pay me. . . . [H]e apologized and said he would get me the money." (H. Tapper Dep. at 33.) Similarly, Tapper's Chief Financial Officer recalled calling PMG and "asking if there was a timing issue or was there a reason why we didn't get funds." (Hutter Dep. at 23.) No evidence indicates that Tapper's instead asked for the refined bars. It is also telling that the police report stemming from Howard Tapper's report indicates that he stated he was owed money and that the property at issue was "MONEY/CASH," and not the bars. (Police Report at 1, 3.)

In short, the evidence is consistent with the conclusion that Tapper's and PMG entered sales contracts in July and September 2013 and that all payments other than the initial September payment under those agreements were to be deferred. It is of no consequence that no written agreement evidences Tapper's arrangement with PMG (*see* H. Tapper Dep. at 13; Hutter Dep. at 35): "A contract for sale of goods may be made in any manner sufficient to show agreement,

including conduct by both parties which recognizes the existence of such a contract." *See* Mich. Comp. Laws Ann. § 440.2204(1); *see also* § 440.2201(3)(c) (providing statute of frauds exception when goods have been "received and accepted" under § 440.2606). And while Tapper's says that "without dispute no consideration was exchanged for the precious metals that Tapper's delivered to PMG" (Pl.'s Mot. at 14), Tapper's delivery of goods in exchange for PMG's promise to pay later would easily qualify as consideration. *See Higgins v. Monroe Evening News*, 272 N.W.2d 537, 543 (Mich. 1978) ("The essence of consideration . . . is legal detriment that has been bargained for and exchanged for the promise.").

But despite these supporting facts, several issues caution against finding as a matter of law that Tapper's losses from July and September 2013 were from property sold under "deferred payment sales agreement[s]." To start, though the parties do not argue that this provision is ambiguous, the policies do not define any of the relevant terms. Nor does any case law interpret this type of provision in an insurance contract. The parties cite nothing, and the Court has not found any cases interpreting similar language. The primary purpose of the "deferred payment sales agreement" language is, apparently, to exclude consignment sales to customers, but the plain language is not limited to such arrangements. Furthermore, without a written agreement concerning the July and September 2013 transactions, and limited to testimony from only one of the parties involved with the transactions, it is difficult to determine as a matter of law whether these transactions qualified as deferred payment sales agreements.

Some evidence is consistent with the conclusion that Tapper's did not intend to complete any sale to PMG until after PMG shipped the bars for a final test to determine the bars' composition, and thus, their value. Though PMG and Tapper's would price each transaction from spot prices on the day of delivery, a transaction's final price depended on the final assay. As

Mark Tapper testified, the real purpose to leave the bars with PMG in the first place was to have "an assay process to understand how much gold is actually there." (Mark Tapper Dep. at 23.) According to Howard Tapper, the bars' content based on the final assay determined whether Tapper's chose to proceed with each transaction. (H. Tapper Dep. at 18.) Thus, at times, Tapper's chose not to finalize a transaction with PMG. (M. Tapper Dep. at 20.) In such circumstances, PMG would not charge Tapper's a refining fee because Tapper's did such a high volume of business with PMG. (*Id.* at 20–21.) No evidence establishes that Tapper's received the final assay for the two deliveries at issue here.

This is all to say that there is enough evidence (or lack thereof) concerning Tapper's arrangement with PMG to bar finding as a matter of law that Tapper's losses in July and September 2013 were from "Property sold under a deferred payment sales agreement after it le[ft] [Tapper's] premises." Chubb's own supervisor of adjusters initially agreed, as he testified that he did not consider this language to be "relevant" to Tapper's claim. (Pl.'s Mot. Ex. 17, Trippel Dep. at 54.)  It is hard to say that no reasonable jury could reach the same conclusion. Thus, a genuine issue of material fact remains concerning whether Tapper's has met its burden to establish coverage, so neither party is entitled to summary judgment on this issue.

**B.**

Chubb next argues that it is entitled to summary judgment because of the policies' dishonest or criminal acts exclusion, which excluded "loss or damage caused by or resulting from any . . . Dishonest or criminal act committed by [certain people, including] . . . Anyone else to whom the property is entrusted." (2012–13 Policy, Jewelers Block Coverage Form at 3; 2013–14 Policy, Jewelers Block Coverage Form at 3.)

13

Tapper's "agrees that a dishonest act was a possibility," but it argues that "there are no known facts upon which any conclusion can be drawn, and Chubb's policies cannot be read to exclude coverage if Chubb only 'suspects' that a dishonest act occurred." (Pl.'s Mot. at 18.) While another close call, the Court agrees with Tapper's: the evidence is insufficient to establish as a matter of law that Tapper's losses arose from the dishonest or criminal act of someone to whom the property was entrusted.

On one hand, the parties do not dispute that neither PMG nor its owner, Allen Light, (fully) paid for the bars stemming from the July and September 2013 deliveries or returned the bars to Tapper's. Nor is it disputed that Howard Tapper filed a police report as a result and that the report described Light as a "suspect," noted that Tapper's loss was from a "theft," and indicated that the reported crime was "Fraud – False Pretense," resulting in the loss of "Money/Cash" to Tapper's. (Police Report.) The report also noted that Light told the police that one of his employees was stealing from PMG, but it does not indicate that was specifically related to Tapper's losses. (*Id.*) Moreover, Howard Tapper wrote in an undated letter that in July 2013, "the representative of PMG *converted* the gold we had provided to PMG for his own uses. A police report was filed." (Def.'s Mot. Ex. 3, Letter from Howard Tapper (emphasis added).) Thus, there is certainly some evidence (and obvious inferences) that the dishonest or criminal acts of PMG or Light—to whom Tapper's entrusted its precious metals for final testing—caused Tapper's losses.

But on the other hand, neither Tapper's one time description of PMG's actions as "conversion" nor the filing of a police report are sufficient as a matter of law to establish that Tapper's losses arose from PMG's dishonest or criminal acts. For instance, Howard Tapper testified that when he filed the police report, he did not "think about criminal activity," "look at it

14

as a theft," or "consider it like a robbery." (H. Tapper Dep. at 36–37.) Rather, he said that he simply wanted "to substantiate what [he was] . . . saying to the insurance company." (*Id.* at 33.) Furthermore, Chubb Claims Examiner James Hamilton wrote in an email, "I did finally get in touch with the detective. He indicated that he has filed an arrest warrant but the prosecutor has not approved it yet. He stated that the prosecutor may decide that this is more of a civil matter." (Def.'s Mot. Ex. 12, Email from James Hamilton.)

There may have been good reason for the prosecutor to consider this a civil matter. Recall that evidence suggests that PMG and Chubb's overall arrangement was a sales agreement. If true, Chubb may have simply breached that agreement. Tapper's Chief Financial Officer testified that he had heard from PMG that they had not paid on time because of a "timing difference on them getting their funds and being able to pay funds." (Hutter Dep. at 24.) That Tapper's chose to continue to do business with PMG after it failed to pay in July 2013 strengthens the inference that this was all a contractual arrangement—one that deteriorated because of PMG's insolvency. And the Court is hard pressed to say that every breach of contract due to a party's inability to pay amounts to a dishonest act.

The bottom line is that no one knows exactly what happened to the metals once in PMG's possession, why they disappeared, and why they failed to pay Tappers in full. (*See* H. Tapper Dep. at 36.) At least one Chubb employee seems to have agreed that establishing that a dishonest occurred is problematic in these circumstances: Chubb's own supervisor of adjustors (who also doubted the relevance of the deferred sales agreement language) wrote at one point, "we can not prove a dishonest act on the part of the refiner." (Pl.'s Mot. Ex. 18, Email from David Trippel.)

Finally, the Court finds unpersuasive Chubb's argument that it need only prove that Tapper's "entrusted" its property to PMG for the dishonest acts exclusion to apply. (*See*, *e.g.*,

15

Def.'s Mot. at 16; Dkt. 22, Def.'s Resp. at 8.) To support this position, Chubb cites a laundry list of cases in which there was no dispute that a dishonest or criminal act occurred, so the only issue was whether the lost property had been "entrusted." *See, e.g., Abrams v. Great Am. Ins. Co., New York*, 269 N.Y. 90, 92 (1935) (considering whether jewelry was "entrusted" to someone who "absconded with the proceeds of her crime to France whence she was extradited and upon indictment pleaded guilty to grand larceny."). Such cases do not apply here.

In sum, as a genuine issue of material fact surrounds what happened to Tapper's bars, and why, neither party is entitled to summary judgment on the application of the policies' dishonest or criminal acts exclusion to Tapper's claim.

## IV.

For the reasons discussed, the parties' motions for summary judgment (Dkts. 18, 20) on counts I and II are both DENIED.[1]

SO ORDERED.

s/Laurie J. Michelson
LAURIE J. MICHELSON
UNITED STATES DISTRICT JUDGE

Dated: December 21, 2015

CERTIFICATE OF SERVICE

The undersigned certifies that a copy of the foregoing document was served on the attorneys and/or parties of record by electronic means or U.S. Mail on December 21, 2015.

s/Jane Johnson
Case Manager to
Honorable Laurie J. Michelson

---

[1] Without summary judgment on count I, it would be premature for the Court to rule on count II—Tapper's claim that Chubb is responsible for the payment of a 12% interest penalty under Michigan's Unfair Trade Practices Act, MCL § 500.2001, *et. seq.*

16